*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ABHIJIT BAGAL, an individual, <br> *Plaintiff (Pro Se),* <br> v. <br><br> RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY; JONATHAN HOLLOWAY, in his official capacity as the President of Rutgers; JEFFREY ROBINSON, in his official capacity as the Chancellor of Rutgers; ENOBONG (ANNA) BRANCH in her official capacity as the Senior Vice President for Equity at Rutgers; JACQUELINE S. MATTIS in her official capacity as Dean of the School of Arts and Sciences at Rutgers; LUCILLE FOSTER in her official capacity as the Chair of the Senate at Rutgers; CORINNE CASTRO in her official capacity as Senior Director for faculty diversity and institutional transformation at Rutgers; AUDREY TRUSCHKE in her official capacity as Professor of History and Asian Studies Director at Rutgers; JOHN AND JANE DOES 1-100; and ABC CORPS. 1-100, <br> *Defendants.* | Case No.: 3:24-cv-11440-ZNQ-JBD <br><br> **AMENDED COMPLAINT FOR:** <br><br> **1. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.** <br><br> **2. Violation of 42 U.S.C. § 1983 (1st Amendment-Free Exercise Clause)** <br><br> **3. Violation of 42 U.S.C. § 1983 (1st Amendment-Establishment Clause)** <br><br> **4. Violation of 42 U.S.C. § 1983 (14th Amendment-Equal Protection Clause)** <br><br> **5. Violation of 42 U.S.C. § 1983 (14th Amendment-Due Process Clause)** <br><br> **6. Violation of 42 U.S.C. § 1985 (3) (Conspiracy to Interfere with Civil Rights and Free Association Rights)** <br><br> **7. Violation of 42 U.S.C. § 1981 (Interference with Right to Contract, Breach of Contract, Implied Covenant of Good Faith, and Fair Dealing)** <br><br> **8. Violation of the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 et seq.** <br><br> **DEMAND FOR JURY TRIAL** |

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

## COMPLAINT

Plaintiff *(Pro Se)* Abhijit Bagal ("Plaintiff") hereby asserts the following causes of action against Defendants RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY; JONATHAN HOLLOWAY; JEFFREY ROBINSON; ENOBONG (ANNA) BRANCH; JACQUELINE S. MATTIS; LUCILLE FOSTER; CORINNE CASTRO; AUDREY TRUSCHKE, JOHN AND JANE DOES 1-100; and ABC CORPS. 1-100, (referred to collectively as "Defendants," except where separately identified), as follows:

## INTRODUCTION

1. On February 29, 2024, a Rutgers student told the US Congress "Rutgers University is an absolute mess, and has failed to meet the moment."

2. All Rutgers students have the right to equal access to educational resources and opportunities in an environment free of any hate, bias, prejudice, hostility, harassment, and discrimination.

3. Rutgers has done an utterly dismal job of protecting its students from discrimination and harassment as evidenced by multiple recent complaints to the Federal Department of Education's Office of Civil Rights and multiple lawsuits filed in New Jersey State Courts.

4. The abovementioned complaints and lawsuits have been filed by Jewish American, Arab/Muslim American, and Hindu American plaintiffs, further confirming the total failure of Rutgers to provide a safe and discrimination-free environment for its students.

5. This lawsuit targets the longstanding, unchecked spread of virulent anti-Hindu hate (also interchangeably referred to as Hinduphobia) at Rutgers. Court intervention is now needed to protect Plaintiff and other Rutgers Hindu students and to end this egregious anti-Hindu hate, discrimination, and harassment, which violates University policy, New Jersey state laws against discrimination, multiple federal civil rights laws, and the US Constitution.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

6.  In August 2024, a University task force on caste discrimination at Rutgers released a report recommending that caste be added as a separate standalone category to its nondiscrimination policy **despite** the existing  Rutgers policy **already** covering ancestry-based discrimination.

7.  Unfortunately, it appears that Defendants either intentionally or implicitly intended to wrongly and unfairly target members of the Indian/South Asian community and adherents of the Hindu religion for disparate treatment. For example, the Rutgers caste task force takes the position that caste is inextricably intertwined with the Hindu religion and India/South Asia.

8.  As detailed below, it seems that the intent was not the laudable goal of broadly protecting individuals from discrimination based on, for example, inherited social class or economic status in all of its forms, but, instead is directed to persons of Indian/South Asian origin and in particular those who identify as, or are perceived to be, practitioners of the Hindu religion.

9.  Plaintiff is a naturalized American citizen who migrated to the US from India and practices Hinduism. Currently, when filing this amended complaint on December 30, 2024, Plaintiff is a student at Rutgers University - Continuing Studies Department's Center for Executive Leadership in Government and is attending classes on a course: "DEI for Public Managers."

10. While Plaintiff applauds Rutgers' efforts to take a firm stance in favor of inclusion and against discrimination – something on which Plaintiff is in complete agreement – the intentional usage of the term "caste" (as opposed to a generic facially neutral term like "inherited social class or status") along with archetypal Hindu words like "Brahmin" and "Dalit" unfairly singles out and targets him as a person of Indian/South Asian origin and a member of the Hindu religion.

11. Rutgers does not need to include the pejorative, demeaning, and loaded term "caste" to protect persons of Indian/South Asian descent or those who identify with or are perceived to be, practitioners of Hinduism since its existing policy already precludes inherited social class or status discrimination specifically based on ancestry, ethnicity, religion, and national origin.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

12. Plaintiff seeks this Court's intervention to set things right by requiring Defendants to enforce Rutgers policies in an evenhanded way, prohibit discrimination and bias as required by law, and treat Hindu students, in the same manner as their non-Hindu counterparts.

## **PARTIES**

13. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

14. Plaintiff was born in India and is an adherent of the Hindu religion. Plaintiff became a naturalized American citizen in July 2006. Plaintiff currently lives and works in the Research Triangle Park (RTP), North Carolina.

15. Currently, as of December 30, 2024, the date of this amended complaint, Plaintiff is a student at Rutgers University - Continuing Studies Department's Center for Executive Leadership in Government and is attending classes in a certificate course: "DEI for Public Managers."

16. Plaintiff ***used to be*** an active member and participant in various non-profit organizations like the Coalition of Hindus of North America (CoHNA), a grassroots Hindu American collective. Plaintiff also ***used to make*** generous monetary donations to these organizations. For reasons explained below, Plaintiff no longer associates with these organizations or donates to them.

17. Plaintiff is the Appellant *(Pro Se)* in a similar and related lawsuit against the Seattle City Council currently under appeal at the 9th Circuit Court of Appeals in California. Defendants have maliciously referenced the above lawsuit by Plaintiff to make false statements and misrepresentations. Defendants have specifically mentioned Plaintiff by name (***Bagal v. Sawant***, No. C23-0721-RAJ) on page 38 of their caste report for fraudulent misrepresentation.

18. Defendant Rutgers, the State University of New Jersey, is a state governmental public entity.

19. Defendant Rutgers is also a "place of public accommodation" as defined within the New Jersey Law Against Discrimination ("NJLAD") N.J.S.A. 10:5-5(l).

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

20. Defendant Jonathan Holloway is the President of the Rutgers University System.

21. Defendant Jeffrey Robinson is the Chancellor of Rutgers University – Newark.

22. Defendant Enobong (Anna) Branch is the Senior Vice President for Equity at Rutgers.

23. Defendant Jacqueline S. Mattis is the Dean of the School of Arts and Sciences at Rutgers.

24. Defendant Lucille Foster is the Chair of the Senate at the Rutgers University System.

25. Defendant Corinne Castro is the Senior Director for faculty diversity and institutional transformation and co-chair of the University task force on caste discrimination at Rutgers.

26. Defendant Audrey Truschke is a Professor of History and Asian Studies Director and co-chair of the University task force on caste discrimination at Rutgers.

27. Defendants John and Jane Does 1 to 100 and ABC Corps. 1 to 100 are fictitious individuals and entities, respectively, that may be responsible for the claims asserted herein and who have a duty to provide for the safety and security of all students within Rutgers and to adhere to and provide the protections and other legal requirements under the NJLAD and Federal laws for implementing policies and procedures to prevent and address, discrimination, retaliation, bullying, harassment or intimidation; the training and supervision of staff responsible for implementing said policies and procedures; and the design and implementation of policies and programs consistent with the NJLAD and Federal Laws.

28. Defendants are considered to be an arm of the State of New Jersey. However, because Defendants are being sued in their official capacities for prospective injunctive relief, the sovereign immunity provisions of the Eleventh Amendment do not apply to them.

29. In fiscal year 2024, Rutgers received over $560 million in financial aid through, among other things, grants and loans, from the federal government as well as substantial indirect federal financial assistance through, among other things, tuition paid with federal financial aid. As a recipient of federal financial assistance, Rutgers is subject to Title VI.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d et seq.).

31. This case arises directly under the First and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, et seq., and the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1, et seq.

32. This Court should exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367 because the state law claims arise from the same case or controversy that gives rise to jurisdiction under 28 U.S.C. § 1331.

33. This Court has personal jurisdiction over all the Defendants because each of them is present, domiciled, resident, or a citizen of this state, working as an elected representative for the state, or undertaking the actions alleged herein in this state.

34. Venue is proper in this court under 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(b)(2), and 42 U.S.C. § 2000e-5(f)(3) as the act of creating, implementing, publicizing, monitoring, and enforcing the new caste report giving rise to the claims of this suit occurred within the state of New Jersey and the Defendants reside and work in this district, or the substantial part of the events or omissions giving rise to the claims at issue occurred in the state of New Jersey.

## FACTUAL BACKGROUND

### A. Discriminatory Animus and Illicit / Invidious Motive of the Task Force

35. In August 2024, the University Task Force on caste discrimination at Rutgers published its report recommending that caste be added as a separate stand-alone protected category.

36. The task force was co-chaired by Audrey Truschke ("Truschke"), a Professor of History and Asian Studies Director at Rutgers Newark.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

37. Truschke has a well-documented history of discriminatory animus towards the Hindu religion and has engaged in anti-Hindu hate speech and Hinduphobia on numerous occasions.

38. Truschke has an illicit and invidious motive, as co-chair of the task force, to conspire with other state and non-state actors, to make false statements and publish fraudulent caste data in the report to justify the addition of caste as a new category to target Hindu Americans.

39. In the past, in March 2021, Hindu students made formal complaints against Truschke to the Rutgers leadership and administrators stating, "We are aghast at the bigotry being peddled against Hindus via continued derision of our religion, our deities, and our sacred texts."

40. These Hindu students at Rutgers had also expressed concern about their safety because of potential attacks, bullying, and backlash, either on campus or via social media, due to false stereotyping of the Hindu religion by Truschke in her classroom and on social media.

41. In April 2018, Truschke called Rama, one of the most revered and central figures in Hinduism and Jainism, a "misogynist pig." What's worse, she claimed using the translation of Professor Robert Goldman, a well-reputed scholar on the Ramayana. However, Goldman has himself clarified that Truschke's words have "nothing to do with our translation," that her language was "highly inappropriate," and that the whole saga was "extremely disturbing" and "quite shocking." This brazen misrepresentation of another professor's work to support these specious, degrading claims aligns with Truschke's discriminatory animus against Hindus.



Dr. Audrey Truschke ✔
@AudreyTruschke

Replying to @AudreyTruschke

For anyone unfamiliar with these episodes, in Valmiki's telling (I'm loosely translating here): During the agnipariksha, Sita basically tells Rama he's a misogynist pig and uncouth. During the golden deer incident, Sita accuses Lakshmana of lusting after her and setting up Rama.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

42. In another article in Aeon Media dated November 6, 2020, Truschke accused the Bhagavad Gita, one of the most famous and sacred Hindu texts that were the basis for Mahatma Gandhi's non-violence movement, of "rationalizing mass slaughter." Without any remorse, she even compared the 2012 Nirbhaya gangrape case in India to an incident in the sacred epic Mahabharata and essentially led readers to conclude that Hinduism endorses "rape culture" and misogyny and thus lacks any ethics or value system.

> The world of the *Mahabharata* is stacked against women. Our world today looks distinct in its details, but some basic principles are not much different. For example, more than one person has compared Draupadi's plight with that of 'Nirbhaya', the name given to the young woman mortally gang-raped in Delhi in 2012. Nirbhaya (meaning 'fearless') resisted her attackers, and one of the rapists later said that this resistance prompted him and his fellow assaulters to be more brutal than they would have been otherwise. Two millennia later, the corrupt 'moral' remains: she should not have objected to unjust treatment.

43. Following the horrific Capitol Hill insurrection and riots in January 2021, which shook our nation's fabric, Truschke tweeted about the presence of an Indian flag at the scene and immediately declared it to be the handiwork of "The Hindu Right," even though various media outlets showed that the flag bearer was a Christian, not a Hindu. Also, the national flags of Israel, Vietnam, Georgia, South Korea, Canada, Australia, and Iran were carried by people to Capitol Hill on that day. Such conflation creates a dangerous environment for Hindus and opens them up for potentially violent attacks by falsely linking Hindus to White Supremacists.



*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

44. On July 1, 2021, a coalition of 75 American Hindu temples and spiritual organizations (including 17 from New Jersey) from across 20 states sent a letter to Rutgers leadership expressing anguish and concerns regarding Truschke's actions and statements.

45. The letter, coordinated by the Coalition of Hindus of North America ("CoHNA"), included some of the largest temples and spiritual organizations, whose memberships include tens of thousands of attendees from diverse sectarian, social, ethnic, and national backgrounds – including from the United States, Canada, India, Guyana, Trinidad & Tobago, Nepal, Pakistan, Bangladesh, Sri Lanka, Fiji, Malaysia, and Singapore, among others.

46. This letter outlined Truschke's selective and out-of-context usage of verses from Hindu texts to create false narratives about Hinduism and India, peddle bigotry and Hinduphobia and advance the idea that Hinduism rationalizes murder, rape, and other social evils. "In doing so, Professor Truschke demonizes Hinduism as inherently misogynistic, oppressive, and savage," added the letter from CoHNA. **Yet, Rutgers leadership and administration did NOTHING.**

47. Truschke is a hyper-active founder member of the South Asia Scholar Activist Collective ("SASAC") a radical, fanatical, and rabidly anti-Hindu organization that was founded in 2021.

48. On August 25, 2021, SASAC released a statement, writing to extend their support to the organizers and participants of an upcoming conference titled "Dismantling Global Hindutva" which was held from September 10 to 12, 2021.

49. Truschke and Rutgers were the supporting co-sponsors of this conference. One speaker at this conference called Hindus "violent, malignant Brahmins" and singled out five Hindu last names: Iyer, Kompella, Trivedi, Sharma, and Mukherji (Mukherjee) as those with a history of extreme violence, quoting that they are "violent advocates of...malignant Brahmanism." Another speaker openly called for the dismantling of Hinduism by saying: "...there is no Hindutva without Hinduism...Hindutva is inextricably linked to and is a form of

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

Hinduism...and we do not think there is any way to understand Hindutva if you disaggregate it from [Hinduism]...and there is absolutely no way to dismantle it...if you are going to...ignore the Hinduism of it.



50. On January 26, 2022, SASAC published another statement declaring "Casteism and Hindu nationalism are deeply intertwined."

51. In yet another statement published on February 14, 2023, SASAC defined caste as "It is a social, cultural, and political hierarchy justified in pre-modern Hindu legal texts in the form of *varna* (class or category) and *jati* (birth group)."

52. SASAC explained further in their statement dated March 28, 2023, "The caste system ranks people according to the overlapping categories of varna and jati in a descending pyramid of human worth." Both varna and jati are archetypal Hindu terms used in the "Hindu pyramid."

53. SASAC also persistently denies the existence of anti-Hindu hate in the US and opposes and denounces proposed legislation on Hinduphobia that would have addressed anti-Hindu hate.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

**B.  Truschke equates caste to Hinduism, i.e., "caste is Hindu *dharma*"**

54. Truschke's August 2024 caste report tries to project caste as a "global phenomenon" and presents it as a "social stratification" experienced by many communities worldwide, including the US. Yet, Truschke, authored a research paper just over two years ago, titled "Caste Control: Towards a Frank Reckoning of Who Represents Hinduism in History."

55. As the title of the above research paper aptly suggests, Truschke hypothesizes that caste is an exclusive Hindu construct, and she quotes Manu (a.k.a. FIRST HINDU MAN)  and Sanskrit Hindu texts to prove her hypothesis: "**Yes, caste is Hindu *dharma*!**" (*dharma* roughly equates to the Hindu religion.) Truschke also concludes that these Hindu religious texts in Sanskrit support Manu's core thesis: "All men are created unequal, with each having a separate duty as per his hereditary social class. Shudras serve, Vaishyas farm, and Kshatriyas govern and fight."

56. Truschke references Suraj Yengde ("Yengde"), a scholar of caste at Harvard, nine (9) times in the caste report to back up her bogus claims. On November 2, 2020, Yengde gave a written declaration, under penalty of perjury, to the  Superior Court of California, Santa Clara. Yengde declared, "It [caste] emanates from the Hindu alias Brahminical books of rule." Yengde then elaborated, "In India's Hindu-based caste system… the ancient Hindu texts, especially Vedas, amplify the distinction of humans based on their qualities of hierarchy." Yengde also stated that caste can be determined using a person's last name, village name, and ancestor's occupation.

57. Yengde, like Truschke has a discriminatory animus towards Hinduism and often engages in anti-Hindu hate speech. In a social media post, Yengde called Hindus the "sick people of India," arguing that it is "their religious books who train the mind,"  implying that Hindus are brainwashed by Hindu dharma's revered, sacred texts and conditioned into an inherently violent and oppressive outlook on the world and must inherently discriminate using caste.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*



58. Truschke references Equality Labs six (6) times and relies upon its bogus caste discrimination data. Thenmozhi Soundararajan ("Soundararajan") founder and director of Equality Labs, also quoted multiple times by Truschke, gave a written declaration, under penalty of perjury, to the Superior Court of California, Santa Clara, on November 2, 2020. This written declaration by Soundararajan emphatically confirmed that caste is "a system of religiously codified exclusion that derives from Hindu scripture." Soundararajan also declared that the Brahmins of India founded the caste system, which has persisted and thrived for over 2,000 years.

59. Equality Labs often engages in actions to stereotype and target practicing Hindu Americans.



Holi is practiced, creating a turbulent and frightening environment where gender based harassment attacks rise during this time. This includes groups of men throwing balloons filled with rocks, water, or *even semen* at femmes who are walking in the street. We cannot expect more from a festival whose heart is quite literally the burning of an Indigenous woman.

Equality Labs
@EqualityLabs

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

60. Equality Labs co-founder and former political director, Sharmin Hossain, has made the following hateful comments about Hindus and Hinduism.



61. Soundararajan, in a speech, on behalf of Equality Labs, made the following Hinduphobic and hateful statements and attacked the Hindu religion by slandering Hindu scriptures:

• *Everywhere South Asians go particularly dominant caste Indian Hindus they take caste*

• *you know make scriptures that enslave our people*

• *I know that there are people who find meaning in books like the Bhagavad-Gita and the Upanishads but every Act of Hindu scripture has done nothing but bring violence and pain and the Nazis aren't Germans in f\*\*\*\*\*g Europe they're actually upper caste Indians*

• *It's really time to disrupt every single space where Hindu nationalists comes into play and its every single person in the diaspora is culpable for the genocide that's happening right now in India because upper caste networks in the United States help to fund the rise of Hindu nationalism that we also have a structural responsibility as South Asians to really come for our f\*\*\*\*\*g Hindu nationalist relatives as if they see on the line right here is to come for your saffron Aunty and Uncle because those people are*

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

*not casual fascists*

*• Past networks have allowed a genocide to occur on their watch*

*• The whole idea of Aryan race theory and Swastika in fact they come from Hindu religious beliefs*

*• So in this context what you see is that you know hey the Hindu Fascism and Nazism have a very interesting you know uh core relationship*

*• but celebration of Diwali is like asking an Indigenous person to celebrate Columbus Day*

*• Namaste is actually part of a caste discrimination in India.*

62. Equality Labs has also been called out for antisemitism. On April 19, 2023, Roz Rothstein, CEO of StandWithUs, an international non-partisan, non-profit organization based in California, wrote a letter to the California State Senate Judiciary Committee. The letter cautioned the Committee against using unreliable data from Equality Labs  by stating "SB-403's 'champions' Equality Labs, is an organization that has also smeared Israel and promoted a campaign of hate that erases over 3,000 years of Jewish history in the region, while seeking to eliminate the world's only Jewish state." Some samples of this antisemitism and hate for the Jewish people and Israel propagated by Equality Labs are shown below.




*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

63. Equality Labs also equates Hindu caste oppression in India to Jewish apartheid in Palestine.





### C. Truschke fabricates caste data for the fraudulent report

64. The unscientific sampling bias of the Equality Labs report that Truschke uses to justify claims of "rampant" caste discrimination in the US was pointed out by the 2020 Carnegie Endowment survey, which shows that alleged caste discrimination is not a significant factor in community interactions among Indian Americans in the United States. The Carnegie report also states that the precise extent and intensity of caste discrimination in the US is debatable since its results contradicted the findings of the Equality Labs report, thereby proving the spurious nature of the Equality Labs caste survey report.

65. Equality Labs has a proven track record of fabricating fake data. The falsification and manipulation of data in the caste survey is part of a larger pattern by Equality Labs. For instance, on September 11, 2020, Equality Labs made a mass appeal to its supporters outside the country to use 95134 as a zip code while filling out one of its petitions to influence

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

technology company policies in the US. The suggested zip code (95134) is the San Jose Silicon Valley location of Cisco Systems. Equality Labs had no qualms in publicly asking international respondents, who should have no bearing or input on the policies of US-based companies to ask for fake data to secure its desired results by asking foreign actors to lie: "We need your help reaching 10,000 signatures on our petition, supported by Color of Change. If you are outside of the United States, use 95134 as your zip code."

**Jai Bhim Equality Labs friends,**

As summer ends, and many of us return to work, we are thinking of the red skies over California and long hospital lines as COVID-19 races across South Asia. For those of you in San Francisco and the Bay, here are disaster preparedness tips and some wildfire safety tips. Meanwhile, in the Gulf of the US and in Bangladesh, Pakistan, and India, entire cities and communities have been decimated by flooding and other forms of climate disaster. Poor, rural, and migrant South Asians are on the frontlines of climate change, confronting the end of entire nations as fossil fuel companies, multinational corporations, and climate deniers sit back. We invite you to tell us how you're experiencing climate disaster and change by replying to this email.

This week, we continue to encourage all of you in our community to fill our Caste in Tech survey and our End Caste in the US petition. Even though many of you may be tired of signing petitions, this one is critical for us to demonstrate public support for ending caste discrimination in the U.S. For many people, caste is something that never made it out of South Asia -- but the reality is, caste is very present in the U.S. Since word of the Cisco case broke in early July, nearly 300 caste-oppressed individuals in the US have reached out to Equality Labs to report stories of caste discrimination in the workplace. That's why we need your help reaching 10,000 signatures on our petition, supported by Color of Change. If you are outside of the United States, use 95134 as your zip code.

66. The Equality Labs survey that Truschke relies on is unscientific since it uses a sample strength of a mere 1,200 cherry-picked respondents from 26 countries - as a representation for the 5-6 million South Asian American diaspora population. Additionally, the research design of the survey was entirely based on anonymous stories of discrimination from across the world by unverified self-respondents. Equality Labs deliberately made a false statement by naming the survey as "Among South Asian Americans" although the survey was self-administered online and was open to anyone with an internet connection in any part of the world, making it highly suspect and invalid from the standpoint of qualified scientific research lacking academic rigor

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

and neutral observers. Hence, the Superior Court of California, Santa Clara had denied judicial notice of the Equality Labs caste survey, yet, Truschke chose to use this bogus survey.

67. Further, the Equality Labs survey makes nonsensical claims like "most Americans who are vegetarian or vegan understand their food preferences to be an individual choice, influenced by personal, environmental, or animal welfare concerns, vegetarianism in South Asian communities is quite different. It is deeply linked to Caste mandates and religious dictates." Therefore, a Hindu American student at Rutgers who requests a vegetarian meal plan from the cafeteria automatically and immediately becomes a suspect case for caste discrimination, whereas a White or Black American student at Rutgers requesting the same vegetarian meal plan is doing it "for the environment or standing up for animals rights."

68. Soundarajan and other Equality Labs officials have on multiple occasions stated that celebrating the Hindu festival of Holi amounts to caste discrimination. Equality Labs believes that "Holi also further reifies Brahmanical Patriarchy by encouraging casteist and sexist slurs that are ritually hurled at Holika's figure as part of the ritual." Hence, any Hindu American student at Rutgers participating in the Holi festival automatically and immediately becomes a suspect case for caste discrimination. For a Hindu American student at Rutgers who requests a vegetarian meal plan and is found celebrating Holi at Rutgers, this creates a "double whammy" case of caste discrimination.

69. Truschke tries to whitewash the Cisco caste discrimination lawsuit, which she references eight (8) times in her report, by suggesting that the California Civil Rights Department (CRD) is still aggressively pursuing this case. The CRD has been unsuccessful in reaching a face-saving settlement and has been dragging its feet. Cisco had to file a Motion to Compel, following which the Court sanctioned the CRD on May 15, 2024, and punished CRD by ordering it to pay $2,000 in sanctions to Cisco. Guha Krishnamurthi, an attorney, and professor at the

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

University of Maryland, was quoted while discussing the Rutgers caste report: "A case filed in 2020 against two Cisco Systems engineers charging caste discrimination, he offers, was voluntarily dismissed for lack of evidence" demonstrating that it was a meritless case without any evidence of caste discrimination.

70. Truschke conveniently forgets to mention in her report that the CRD defined caste as a "strict HINDU social and religious hierarchy" and forcibly assigned a "Hindu Brahmin Upper caste" to one of the defendants simply because the defendant's last name happened to be "Iyer." Defendant Iyer has been publicly irreligious for decades and this fact was known to CRD. Yet, CRD violated an American citizen's right to freedom of religion under the 1st Amendment because CRD assumed that anyone with the last name of "Iyer" must be a "Hindu Brahmin Upper caste" discriminator.

71. Thus, using the logic from the Equality Labs survey report (quoted six times in Truschke's report) combined with Yengde's (quoted nine times in Truschke's report) theory of determining the caste of a person, and using the *CRD v. Cisco* caste lawsuit (quoted eight times in Truschke's report), a Hindu American student at Rutgers, (1) with the last name of "Iyer," (2) with parents from the temple town of Madurai in South India, (3) whose grandfather was the temple priest, (4) has requested a Vegetarian meal plan at the Rutgers cafeteria, and (5) is found celebrating Holi in Rutgers campus; WILL BE FOUND LIABLE FOR FIVE COUNTS OF CASTE DISCRIMINATION as per Truschke's report.

72. Truschke makes a disingenuous attempt to portray the BAPS New Jersey Swaminarayan Hindu temple lawsuit as a case of caste discrimination. If an Islamic Mosque in New Jersey had imported cheap Muslim labor from Turkey, no one would have raised the caste bogey and would have simply said it was a human trafficking violation case. Whether caste or caste discrimination laws exist (or not) in New Jersey or the US would have had no bearing on

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

prosecuting the guilty and resolving the case. The BAPS case, too, has been investigated (for the last three years) under human trafficking laws, but Truschke found it compulsory to falsely present it as a case of Hindu caste discrimination.

73. In the report, Truschke makes false claims that the Seattle caste lawsuit has been dismissed due to lack of standing. Truschke then makes another false claim about the California State University (CSU) caste lawsuit by stating that the Court dismissed all of the claims for lack of standing, except the plaintiffs' alleged violation of the Establishment Clause of the First Amendment, which was dismissed on the merits. Both these cases are very much active and currently under litigation at the US Court of Appeals for the 9th Circuit in California and are being considered for an upcoming oral argument in January 2025 at the 9th Circuit Appeals Court in Pasadena, California. Plaintiff is an Appellant in the Seattle caste lawsuit.

74. Truschke either is oblivious or deliberately hides the fact that Americans United for Separation of Church and State, a Civil Rights Organization, has filed an Amicus Brief in the CSU Caste Lawsuit. The Amicus Brief states that the Establishment Clause requires the government to act neutrally toward religion, prohibits the government from preferring or disfavoring any faith, and emphasizes that a nondiscrimination policy cannot single out a particular religion for disfavored treatment.

**D. Another research study from <u>Rutgers ITSELF</u> exposes Truschke's misrepresentation**

75. On November 25, 2024, a joint research report published by Rutgers University and its Network Contagion Research Institute (NCRI) titled ***INSTRUCTING ANIMOSITY: HOW DEI PEDAGOGY PRODUCES THE HOSTILE ATTRIBUTION BIAS*** validated that although DEI and caste initiatives are designed to foster a more equitable and inclusive environment, they may cultivate an atmosphere of ideological conformity, which can exhibit authoritarian, discriminatory, and hostile tendencies.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

76. The Rutgers NCRI study confirms serious methodological flaws in Equality Labs' caste sensitivity survey and training, which, instead of fostering understanding, increases assumptions of bias, promotes demonization, and amplifies prejudice against Hindus.

77. The Rutgers NCRI study reveals that participants exposed to Equality Labs materials exhibited increased acceptance of hateful, dehumanizing rhetoric against Hindus, with demonizing terms adapted from Hitler's quotes gaining significant support.

78. Research by Carnegie, Johns Hopkins, and U Penn indicates few American Hindus born in the US identify strongly with caste, with less than half reporting any connection to a caste group.

79. Exposure to the Equality Labs intervention significantly increased participants' perception of microaggressions, perceived harm, and assumptions of bias during the interview process, with increases of 32.5%, 15.6%, and 11%, respectively, compared to the control group as per the Rutgers NCRI study.

80. Specifically, test subjects who were subjected to Equality Labs' characterization of Hinduism were more likely to exhibit authoritarian behaviors as per the Rutgers NCRI study.

81. Shockingly, the Rutgers NCRI report divulges that participants who read the Equality Labs essay were 19% more likely to punish the administrator and 47.5% more likely to perceive Hindus as racist compared to the control group.

82. Caste training programs can deeply instill biases, prejudices, and hatred to the extent that rhetoric similar to Hitler's becomes acceptable and is considered for implementation against specific caste groups, such as Brahmins as per the Rutgers NCRI study.

83. Caste initiatives, particularly those targeting Hindus with caste-based discrimination narratives, often backfire, fostering division, hostility, and bias rather than promoting inclusivity as per the Rutgers NCRI study.

84. Significant increase in agreement with demonizing statements adapted from Adolf Hitler's quotes, replacing "Jew" with "Brahmin." Statements like "Brahmins are parasites," "Brahmins are viruses," and "Brahmins are the devil personified" gained significant support from

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

participants exposed to the DEI content, with increases of 35.4%, 33.8%, and 27.1%, respectively as per the Rutgers NCRI study.

85. Participants were MUCH MORE LIKELY to AGREE with Hitler's quotes (with the word "Brahmin" replacing "Jew"). Exposure to anti-casteism DEI content led to a **35% increase in agreement with Hitler's quotes** when the study team replaced the term "Jews" with "upper-caste members" as per the Rutgers NCRI study.

86. Training individuals to view the Hindu and Indian community through the lens of "oppressive upper castes" and "oppressed lower castes," as promoted by Equality Labs, may inadvertently target Hindu communities for increased surveillance and scrutiny by mainstream Americans as per the Rutgers NCRI study.



← **Post**                                    Reply  ⇅

**NCRI** **Network Contagion Research Institute** ✔    ···
       @ncri_io

(4/7) One striking finding: Exposure to anti-casteism DEI content led to a **35% increase in agreement with Hitler quotes**, when we replaced the term "Jews" with upper-caste members.

**Figure 7: Increased Agreement with Anti-Brahmin Statements Following DEI Content Exposure**

Figure 7: Respondents who saw the treatment essay showed an increase in belief that negative quotes about Brahmin were accurate compared to the control group. Percentages reflect percent differences in mean scores between those who saw the treatment and the control[28].

11:34 AM · Nov 25, 2024 · **16.4K** Views

## LEGAL FRAMEWORK

87. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

### i.    Title VI of the Civil Rights Act of 1964

88. Title VI of the Civil Rights Act of 1964 ("Title VI") provides that "[n]o person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

89. Title VI directs federal agencies to carry out this mandate by issuing rules conditioning the continued receipt of federal funding on compliance with the anti-discriminatory objectives of the statute. Title VI prohibits harassment based on race, color, or national origin that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity.

90. Title VI also prohibits discrimination, including harassment, based on an individual or group's actual or perceived "shared ancestry or ethnic characteristics" or "citizenship or residency in a country with a dominant religion or distinct religious identity" such as Hindu Americans from India or of South Asian descent.

### ii.    The First Amendment

91. The First Amendment to the United States Constitution provides, in part, that "Congress shall make no law respecting an establishment or religion or prohibiting the free exercise thereof." US Constitution amendment I (the "Religion Clauses").

92. Those Religion Clauses are the basis of the religious freedoms enjoyed in the United States.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

93. The Religion Clauses apply to the States under the Fourteenth Amendment. *See*, e.g., *Kennedy v. Bremeton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).

94. The Religion Clauses have "'complementary' purposes, not warring ones where one Clause is always sure to prevail over the other . . . ." *Id.* at 2426 (quoting *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 13 (1947)).

95. As the Supreme Court held long ago, "when . . . presented with a state law granting a denominational preference, [Supreme Court] precedents demand that [courts] treat the law as suspect and that [courts] apply strict scrutiny in adjudging its constitutionality." *Larson v. Valente*, 456 U.S. 228, 246–48 (1982); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2417 (2018); *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017).

96. This case now before the Court "pits two competing values that we cherish as a nation: the principle of non-discrimination on the one hand, and the First Amendment's protection of free exercise of religion on the other hand. . . . ***Under the First Amendment, our government must be scrupulously neutral when it comes to religion: It cannot treat religious groups worse than comparable secular ones***." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 22-15827, 2022 WL 3712506, at \*\*2–3 (9th Cir. 2022) (emphasis added).

97. Specifically, state actors like Defendants cannot single out religions for ridicule by ascribing to them tenets that are not part of their faith and that members of that faith find repugnant.

98. The First Amendment ***requires*** that the government "proceed in a manner neutral toward and tolerant" of people's "religious beliefs*." Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*, 138 S.Ct. 1719, 1731 (2018). And, while neutrality is compelled as between religious and secular groups, there must be "strict adherence to the 'principal of denominational neutrality . . . .'" where, as here, one religion is treated differently than all others*. Adair v. England*, 183

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

F. Supp.2d 31, 48 (D.D.C. 2002) (quoting *Larson* at 246–47). This has been bedrock constitutional law for decades. *See, e.g.*, *Larson*, 456 U.S. at 246 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 305 (1963) (internal punctuation omitted) ("the fullest realization of true religious liberty requires that government effect no favoritism among sects and that it work deterrence of no religious belief")); *Epperson v. Arkansas*, 393 U.S. 97, 98 (1968) ("The First Amendment mandates governmental neutrality between religion and religion . . . . The State may not aid or oppose any religion . . . . This prohibition is absolute.").

99. The caste report violates those basic tenets of the Religion Clauses by ascribing an oppressive and discriminatory caste system to the entire Hindu religion. In this manner, the caste report ascribes a negative (and false) attribute to a particular faith – Hinduism – that is not neutral or generally applicable since it singles out only a supposed practice of the Hindu religion.

100.    Not only are Defendants constitutionally prohibited from linking caste system with the Hindu religion which they project as inherently discriminatory, but that conclusion is simply wrong and malicious.

101.    Indeed, Plaintiff here does not believe in nor engage in caste discrimination at all. Rather, Plaintiff abhors it, along with all other forms of discrimination. It is Plaintiff's sincerely held religious belief that the Hindu religion in no way includes or endorses an oppressive and discriminatory caste system, yet Defendants have now told Plaintiff that it is a part of Plaintiff's religion and that Plaintiff must be a part of inherent caste discrimination either by being the Oppressor/Dominant/Upper caste or the Oppressed/Dominated/Lower caste.

### iii.    The Fourteenth Amendment

102.    The Equal Protection Clause of the Fourteenth Amendment "prohibits the government from classifying people based on suspect classes, unless the classification is narrowly tailored

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

to satisfy a compelling governmental interest . . . ." *Al Saud v. Days*, 36 F.4th 949, 953 (9th Cir. 2022) (citing *Kadrmas v. Dickinson* Pub. Sch., 487 U.S. 450, 457–58 (1988)).

103.    "[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fisher v. University of Texas*, 570 U.S. 297 (2013) at 310 (quoting *Fullilove v. Klutznick*, 448 U.S. 448 (1980) at 523*)*.

104.    Consequently, the general rule is that when a state actor explicitly treats an individual differently based on race, strict scrutiny is applied. *Id.; Johnson v. California*, 543 U.S. 449 (2005) at 505; *Adarand Const., Inc. v. Pena*, 515 U.S. 200, 227 (1995). The Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications, such as race-conscious university admissions policies, race-based preferences in government contracts, and race-based districting intended to improve minority representation." *Johnson*, 543 U.S. at 505.

105.    Race, ethnicity, national origin, and religion are protected classes under the Equal Protection Clause. *See, e.g*., *Days*, 36 F.4th 949; *Mitchell v. Washington*, 818 F.3d 436, 444–45 (9th Cir. 2018).

106.    By drafting the caste report to specifically add caste as a new, separate, and stand-alone protected category, Defendants impermissibly singled out Hindu Americans (like Plaintiff) and those of Indian/South Asian origin, based on their perceived national origin or ancestry (Indian/South Asian) and religion (Hinduism).

107.    Truschke cites numerous unrelated news articles, anecdotes, events, and individual statements to declare that caste is found significantly among South Asian Americans and that 1 in 4 caste-oppressed people faced physical and verbal assault, 1 in 3 education discrimination, and 2 in 3 (67 percent) workplace discrimination. Truschke does not provide any factual data or evidence (such as the number of caste discrimination assaults, complaints,

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

police records, court dockets, or lawsuits reported in the US in the last ten years and their outcomes) to support these scandalous statements and sensational statistics of caste discrimination in the US. Earlier, the Superior Court of California, Santa Clara, had denied judicial notice of these items, yet, Truschke chose to use these anecdotal hearsay in the report.

### iv.    The Due Process Clause - Vagueness

108.    The Due Process Clause of the Fourteenth Amendment requires: First, laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. . . . The vagueness doctrine's second requirement aims to avoid arbitrary and discriminatory enforcement and demands that laws provide explicit standards for those who apply them. A law that relies on a subjective standard—such as whether conduct amounts to an annoyance—is constitutionally suspect. *Edge v. City of Everett,* 929 F.3d 657, 664–65 (9th Cir. 2019); *see also Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015). This is referred to as the vagueness doctrine. *See Edge*, 929 F.3d at 664.

109.    While a statute or policy need not be perfectly clear to survive a vagueness challenge, it must nonetheless provide a code of conduct that ordinary citizens can follow to reasonably avoid violation. *See Wal-Mart Stores, Inc. v. City of Turlock*, 483 F. Supp.2d 987, 1021 (E.D. Cal. 2006) ("If a statute is not sufficiently clear to provide guidance to citizens concerning how they can avoid violating it and to provide authorities with principles governing enforcement, the statute is invalid."); *Santa Cruz Lesbian & Gay Comm. Ctr. v. Trump*, 508 F. Supp.3d 521, 536 (N.D. Cal. 2020) (executive orders considered void for vagueness when they left plaintiffs unsure as to whether they could continue providing diversity and inclusion training without violating them).

110.    The caste report is unconstitutionally vague to the extent that it prohibits discrimination based on caste.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

111.    Truschke's caste report does not provide any clear guidelines on determining the caste of any person (including Plaintiff) other than making vague and absurd suggestions like "I told him that I eat meat, fish, and eggs and mentioned how the landlord never mentioned anything to that effect." Nor does it provide any framework for determining whether caste discrimination took place or not. As per Truschke's caste report, Rutgers students could be charged with caste discrimination based on their name, who they are married to, their dietary habits, for celebrating popular festivals like Holi and Diwali, for wearing Mauli (sacred thread worn on the wrist), for visiting their local temples, for not inviting their co-students to a party, for requesting vegetarian food, or for not serving meat, fish, and eggs to friends or guests.

112.    Even those of Indian origin or those who identify as Hindu may very well be unfamiliar with what caste means because there simply is no universally agreed-upon definition and because it is a foreign concept. This is especially true for second and third-generation Hindu Americans whose parents or grandparents may have come from different parts of India with different names and dietary habits. Further, some names are shared by people from different regions of India belonging to different castes, so Rutgers may have to send its caste investigators to different States of India to determine the "true" caste of a person.

**v. Plaintiff has suffered (and is still suffering) a concrete injury in fact**

113.    A dispute constitutes a justiciable case if a plaintiff has a personal interest at stake. A threat of injury, even if the threat is small, establishes a personal interest. Courts have defined the interests to support standing broadly to include not only economic and physical interests, but also aesthetic, spiritual, and recreational interests. *See Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 154 (1970).

114.    Article III does not distinguish between low risks of harm and high risks of harm. The judicial power is properly invoked when a plaintiff has at stake a personal interest that is

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

adverse to the defendant's interest and a court can vindicate that interest immediately through a judicial order based on a legal determination of the rights of the parties. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). (noting that to be justiciable, the dispute must "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts" (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)) (internal quotation marks omitted)).

115.    A plaintiff facing a threat of injury from a defendant's illegal conduct meets this threshold. That plaintiff has an interest in preventing the injury from occurring, or at least an interest in reducing the risk of its occurrence. That is the reason why Courts have held that they have jurisdiction to hear claims for prospective relief. *NRDC v. EPA*, 464 F.3d 1, 7 (D.C. Cir. 2006) (finding risk of 1 in 200,000 sufficiently substantial to support standing).

116.    The same reasoning applies when the risk of injury is extremely low. In such cases, the plaintiff still has a personal interest that the Courts may vindicate through an appropriate order. The fact that the injury might not occur does not render the claim nonjusticiable; otherwise, federal Courts would lack jurisdiction to hear any claims for prospective relief because all potential future injuries have some chance of not transpiring.

117.    Rather, it is the possibility that the injury might occur that creates the plaintiff's interest in the case and that ought to render the case justiciable. Even when the risk of harm is extremely low, there is still some chance that the threatened injury will occur. The plaintiff accordingly has an interest at stake: he or she may be harmed.

118.    The Rutgers caste report has caused Plaintiff to refrain from celebrating the Hindu festival of Holi, wearing Mauli, adorning any Hindu religious markers while attending Rutgers DEI classes, eating vegetarian food, and attending events of CoHNA or donating to CoHNA.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

119.    Plaintiff is therefore no different than the *Dreihaus* plaintiffs who "planned" to speak about taxpayer-funded abortion but refrained due to the law at issue, *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 154 (2014); or the *Bayless* plaintiffs who "wanted to disseminate advertising without providing twenty-four-hour advance notice" except the law prohibited that conduct, *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). Those cases establish that plaintiffs possess standing when they refrain from certain conduct due to a challenged law. That is precisely the argument Plaintiff makes here.

120.    While attending classes for the Rutgers DEI course, Plaintiff has refrained from making any statements concerning his religious beliefs, vegetarian diet, past association with CoHNA, and his past history of celebrating Holi and Diwali.

121.    Truschke on numerous occasions, has called CoHNA and its members upper caste right-wing Hindu fundamentalists responsible for the genocide of Muslims in India. However, Truschke has failed to provide any concrete evidence or data to support her claims.

122.    Equality Labs and Soundararajan with whom Truschke conspired and collaborated to publish the caste report, describe Holi as "upper-caste cultural domination of the South Asian diaspora," hence, anyone celebrating Holi would be considered "saffron-washed," and "violent," involved in "white supremacy and settler colonialism" and "Brahmanical" i.e., "Upper Caste Oppressor."

123.    Similarly, the Equality Labs caste survey report used by Truschke to prove claims of "rampant caste discrimination" in Rutgers, New Jersey, and the rest of the US asserts that eating vegetarian food sends a message of "upper Caste Hindu cultural hegemony."

124.    Due to the above acts, Plaintiff has undergone significant trauma, being compelled to shoulder unwarranted guilt and endure a silent toll on his reputation. Personal and social ramifications have been and continue to be profound for Plaintiff.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

125.    Plaintiff faces daily challenging decisions within his social circles, grappling with what to say, do, eat, celebrate, or abstain from saying, doing, eating, or celebrating.

126.    Because of Plaintiff's immigrant Hindu South Asian heritage, derogatory inquiries regarding his ethnicity and religious customs have become increasingly prevalent.

127.    Plaintiff has refrained from engaging in social interactions with numerous colleagues and co-students out of apprehension regarding potential experiences of discrimination or being associated with such actions.

128.    Individuals have frequently condescended to Plaintiff with moral indignation, often coercing him to denounce the Hindu caste system to absolve Plaintiff of perceived ignorance.

129.    In the Rutgers DEI classes, asserting opposition to a hypothetical caste discrimination system has become the sole means by which Plaintiff is deemed worthy to express an opinion, and it serves as an ongoing effort to affirm Plaintiff's innocence.

130.    Equality Labs and Truschke went as far as to publish anonymous letters lacking credible evidence to assert: "working with Indian managers is a living hell." This has hindered Plaintiff's career and future job prospects and left a permanent damaging scar on his life. This barrage of comments and attitudes has eroded Plaintiff's reputation and, indirectly, his sense of self-worth.

131.    Plaintiff declines to participate in Hindu festivals like Holi because Truschke's report treats participating in Holi as "celebrating the burning of a Dalit woman by upper caste men."

132.    While attending the Rutgers DEI classes, Plaintiff has stopped wearing a Mauli or adorning any other Hindu religious markers.

133.    Plaintiff no longer discusses his religious beliefs or dietary habits in public or the Rutgers DEI classes because of Truschke's report. This amounts to self-censorship and is recognized as constitutionally sufficient in *Getman*. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir. 2003).

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

134.    The Supreme Court further recognized this constitutionally prohibitive self-censorship in *Driehaus*, where the Court held advocacy organizations possessed Standing to assert a pre-enforcement facial challenge to a statute criminalizing false statements made about candidates during political campaigns. *Driehaus*, 573 U.S. at 167-68. The Court explained because the organizations intended to engage in future conduct concerning "political speech, it [wa]s certainly 'affected with a constitutional interest.'" Id. at 162 (quoting *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (2014)).

135.    Plaintiff should not have to bear Hobson's choice of refraining from core protected speech and religious activities or "risking costly [administrative] proceedings." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 168 (2014); *see Kennedy v. Bremerton School Dist.,* 597 U.S. at 523 (2022) ("Where the Free Exercise clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities."). That is true regardless of whether the injury is actual or imminent. Indeed, *Bowen* makes clear a well-founded fear the Ordinance will be enforced in any manner is sufficient to confer Standing. *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867 (9th Cir. 2013).

136.    Plaintiff wants to exercise his constitutional rights to celebrate Hindu festivals like Holi, wear Mauli, participate in CoHNA events, speak freely in the Rutgers DEI classes, be able to choose whether he eats a vegetarian meal or not, and discuss issues related to his faith but declines to do so because it is unclear whether his actions will be considered casteist and in violation of Truschke's report. Those self-imposed limitations create the same constitutional harms identified in *Getman, Bowen*, and *Driehaus*—where the Ninth Circuit and the Supreme Court found Standing to exist, hence this District Court should reach the same conclusion as well and concur with the Ninth Circuit and the Supreme Court.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

**vi. Discriminatory Animus, Illicit Motive, and Conspiracy to deprive civil rights**

137.    Truschke (state actor), Yengde, Soundararajan, Equality Labs, and other powerful academics at SASAC have formed a cabal to conspire and collaborate in targeting Hindu Americans by deliberately using Hindu terms like "caste," "Brahmin," "Dalit," "jati," and "varna" despite having the alternative to use generic facially neutral terms like "inherited social class or status" or "social classification, stratification, and hierarchy" that apply **GLOBALLY**.

138.    Truschke has openly declared her discriminatory animus numerous times by equating caste with Hinduism and stating that "caste is Hindu dharma" which in no way sounds **GLOBAL**.

139.    Truschke has made false statements using a fraudulent survey: "Data from Equality Labs show that one in four caste-oppressed people faced physical and verbal assault, one in three faced education discrimination, and two in three (77%) faced workplace discrimination" even though this fraudulent survey was denied judicial notice by the Superior Court of California, Santa Clara. Yet, Truschke had no qualms about using this spurious and dubious survey.

140.    On November 2, 2020, Soundararajan, representing Equality Labs,  gave a written declaration to the Superior Court of the State of California, County of Santa Clara stating the following.

141.    *Caste is a structure of oppression that affects over 1 Billion people across the world. It is a system of religiously codified exclusion that derives from* ***Hindu Scripture****.*

142.    ***Brahmins****, who founded India's caste system, are at the top of the caste system and have benefited from centuries of privilege, access, and power because of it.*

143.    *This entire system... most notably* ***India****... has persisted and thrived for more than 2,000 years.*

144.    *The irony... while the* ***Indian caste system*** *to which the complainant belongs has its origins in* ***Hindu scripture****....*

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

145.    *At Equality Labs, our experience has been that **dominant-caste** people openly boast about their caste privilege and supposed **biological superiority***.

146.    *The culture of intimidation of **Dalits** who report casteism has **old roots in the culture of impunity in India.***

147.    Plaintiff has demonstrated causation because the only aspect of Truschke's report that could support claims of discrimination against Plaintiff for his Hindu practices is the use of the term caste. The injury is redressable. Adding caste to Rutgers policy allows Defendants to make accusations against Plaintiff based on his religious practices, such as celebrating Hindu festival Holi, eating vegetarian food, wearing religious symbols like Mauli, and participating in activities held by CoHNA due to the direct association Truschke, Rutgers, Yengde, Soundararajan, Equality Labs, and others have alleged between these activities and caste.

148.    If Truschke's and Rutgers' (supposedly) noble intent was to prohibit all forms of worldwide GLOBAL discrimination based on inherited class or social status, which also includes caste discrimination, why did Truschke and Rutgers not use a generic and global term like "inherited class or social status" that covers all birth-based class discrimination in all parts of the world? This generic and global term is facially neutral, includes not only caste but also any other advantages or disadvantages based on parentage or ancestry, and is equally applicable to all Americans and Non-Americans irrespective of their ancestry, skin color, ethnicity, race, caste, creed, tribe, religion, and national origin. Instead, Truschke's deliberate usage of the term "caste" coupled with Hindu archetypal words like "Brahmin" and "Dalit" was maliciously and purposefully intended to target and racially profile Hindu Americans.

149.    The enactment of this addition of caste to Rutger policy marginalizing Hindu Americans and relegating them to second-class status inflicts tangible harms that can range from economic setbacks, stigmatic injury, and intentional infliction of emotional distress to physical harm.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

150.    Removing caste or replacing it with a neutral term like "inherited social class or status" and removing any and all references to Hinduism, India, South Asia, and any other religion, country, continent, or scriptures eliminates the risk to Plaintiff and all others similarly situated.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR VIOLATION OF TITLE VI

### Of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*

### (Intentional Discrimination and Hostile Environment Towards Hindu Students)

151.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

152.    Defendant Rutgers receives financial assistance from the US Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

153.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her ancestry, race, ethnic characteristics, or national origin.

154.    Discrimination against Hindu students is prohibited under Title VI of the Civil Rights Act of 1964, as reflected in the written policies of the Department of Education's Office for Civil Rights.

155.    The acts and omissions of Rutgers and its administrators subjected, and continue to subject, Plaintiff and other Hindu student members at Rutgers to discrimination and harassment on the basis of their actual and/or perceived Hindu ancestry, race, ethnic characteristics, religion, or national origin.

156.    Rutgers and its administrators had actual notice that such discrimination and harassment, over which Rutgers has substantial control and the authority to remediate, was and continues to be so severe, pervasive, and objectively offensive that it created and continues to create a

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

hostile environment based on Hindu ancestry, race, ethnic characteristics, religion, or national origin that deprives Plaintiff and other Hindu Rutgers student members of full access to Rutger's educational programs, activities, and opportunities.

157.    Rutgers and its administrators intentionally discriminate against Plaintiff and other Hindu Rutgers student members on the basis of their actual and/or perceived Hindu ancestry, race, ethnic characteristics, religion, or national origin, as exhibited by Rutgers and its administrators' deliberate indifference to the anti-Hindu hate, harassment, and discrimination in violation of Title VI. Specifically, Rutgers and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Plaintiff and other Hindu Rutgers student members and the hostile environment that Plaintiff and other Hindu students are forced to endure at Rutgers because of their race, religion, ancestry, ethnic characteristics, or national origin. Additionally, Rutgers continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, discrimination, eliminate any hostile environment, and prevent the harassment and discrimination from recurring. Such unlawful deliberate indifference causes Plaintiff and other Hindu student members at Rutgers to be subjected to a hostile and discriminatory educational environment.

158.    Defendants' failure to enforce Rutgers policies has created an environment that is hostile towards Plaintiff and other Rutgers Hindu American students. The hostility towards Hindu members of the Rutgers community is severe enough that it interferes with their (and Plaintiff's) ability to participate in programs such as DEI classes and activities of the school such as celebrating Holi, eating vegetarian food, wearing Mauli, as described in the allegations above. Plaintiff and other Hindu students at Rutgers have effectively been excluded from participation in, and have been denied the benefits of, educational, networking, and other

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

programs at Rutgers. Specifically, while Hindu students can in theory discuss their beliefs and religious practices, they can do so only by renouncing or pretending to renounce an immutable aspect of their identity or by remaining silent. Neither "solution" is tenable, nor can either lawfully be required of any individual.

159.    The environment at Rutgers, which has been rendered hostile for Plaintiff and other Hindu Rutgers student members as a result of their Hindu religious, ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives Plaintiff and other Hindu Rutgers student members of equal access to the educational opportunities and benefits that Rutgers provides to non-Hindu students.

160.    Rutgers and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

161.    Rutgers and its administrators also directly and intentionally discriminate against Plaintiff and other Hindu Rutgers student members, with their actual or perceived Hindu religion, ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Rutgers' actions, the latest being Truschke's recommendation to add caste as a new protected category even though the existing policy includes ancestry, which already covers caste.

162.    Rutgers continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving anti-Hindu hate or where the victim or complainant is a Hindu and/or South Asian Indian student, including Plaintiff and other Hindu Rutgers student members. As detailed above, Rutgers' actions, inactions, and conduct were, and continue to be, intended to treat Plaintiff and other Hindu Rutgers student members differently as Hindu students as compared to other similarly situated non-Hindu and/or non-South Asian Indian students.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

163.    Rutgers' violations of Title VI are the actual, direct, and proximate causes of Plaintiff and other Hindu Rutgers student members' injuries.

164.    As a result of the foregoing, Plaintiff and other Hindu Rutgers student members have suffered, and continue to suffer, substantial damages, in amounts to be determined at trial.

165.    Plaintiff and other Hindu Rutgers student members have been and will continue to be injured because Rutgers has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Hindu religious, ancestry, race, ethnic characteristics, or national origin.

166.    Plaintiff is entitled to appropriate injunctive relief under Title VI, because Rutgers has knowledge of, and has been and continues to be deliberately indifferent to, a hostile and discriminatory environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent Rutgers from continuing to discriminate against its students on the basis of Hindu religious, ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm Plaintiff and other Hindu Rutgers student members will otherwise continue to suffer is irreparable.

### SECOND CLAIM FOR VIOLATION OF FREE EXERCISE CLAUSE
### OF THE FIRST AMENDMENT TO THE UNITED STATES
### CONSTITUTION – 42 U.S.C. § 1983

167.    Free exercise of religion "means first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dept. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990).

168.    Defendants were state actors and/or acting under the color of state law when they promulgated the caste report.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

169.   Defendants are state actors and/or acting under the color of state law in enforcing the addition of caste to Rutgers policy.

170.   Violations of the First Amendment are actionable under 42 U.S.C. §1983.

171.   "The [Free Exercise Clause of the] First Amendment protects the rights of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. *Our Lady of Guadalupe Sch*., 140 S. Ct. at 2055 (*citing Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am*., 344 U.S. 94, 116 (1952)).

172.   Addition of caste violates the Free Exercise Clause of the First Amendment by, inter alia, defining the contours and practices of the Hindu religion by impermissibly (and erroneously) concluding that inherent to the teachings and practices of Hinduism is a "caste system" characterized as a racist and oppressive system of discrimination and violence against others.

173.   Addition of caste is neither neutral nor generally applicable in that it, inter alia, refers to caste (associated primarily with Hinduism and India/South Asia); is being specifically applied only to certain groups of people; and does not apply to other groups such as American Indians/Alaska Natives, and Native Hawaiians & Other Pacific Islanders.

174.   Addition of caste is not narrowly tailored to meet a compelling government interest.

175.   As a result of the recommended addition of caste to Rutgers policy violating the Free Exercise Clause, Plaintiff has suffered a de facto irreparable injury.

176.   Enforcing the caste policy will not only cause Plaintiff (and others similarly situated) to live with the fear of being disciplined for committing discrimination they did not commit, but such accusations also – and indeed the mere stereotypes and implicit bias the addition of caste has perpetuated – will follow them throughout the rest of their careers and lives as has happened with Mr. Sundar Iyer in the Cisco caste lawsuit. Mr. Iyer, over 20 years ago, while

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

he was a student at Stanford University, had published a blog (which is still available in the public domain) in which he had declared himself irreligious. Mr. Iyer also personally solicited John Doe (in part due to his long-standing relationship with Doe as a classmate at the Indian Institute of Technology) and hired Doe as a Principal Engineer with a remarkably high salary, despite his alleged knowledge of Doe's caste. Mr. Iyer gave up 100% of his CEO equity worth several million dollars to all his employees, including John Doe. Mr. Iyer also promoted a different Meritorious Dalit to a leadership position, but the CRD did not even bother interviewing that Meritorious Dalit. Yet, the CRD labeled Mr. Iyer, based on his last name, a "Brahmin Upper caste Oppressor," personal details and pictures were leaked online, a brutal witch hunt and trial by media ensued, and Mr. Iyer had to leave Cisco, while John Doe is still working at Cisco.

177.    As Plaintiff's constitutional violations are ongoing and capable of repetition, Plaintiff is entitled to injunctive relief.

### THIRD CLAIM FOR VIOLATION OF THE ESTABLISHMENT CLAUSE
### OF THE FIRST AMENDMENT TO THE UNITED STATES
### CONSTITUTION – 42 U.S.C. § 1983

178.    Defendants, through the caste report and elsewhere, have unilaterally determined that the contours of Hinduism include caste and an oppressive and discriminatory caste system.

179.    Some groups like Native Americans have been provided immunity from caste discrimination while others like Indian Americans are being singled out and targeted.

180.    The caste policy is not narrowly tailored to meet a compelling government interest.

181.    Defendants were state actors and/or acting under the color of state law when they promulgated the addition of caste to Rutgers policy.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

182.    Defendants are state actors and/or acting under the color of state law in enforcing the addition of caste to Rutgers policy.

183.    As a result of recommending the addition of caste to Rutgers policy violating the Establishment Clause, Plaintiff has suffered a de facto irreparable injury.

**FOURTH CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE**

**OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES**

**CONSTITUTION – 42 U.S.C. § 1983**

184.    Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

185.    Defendants have, in their official capacities, deprived Plaintiff of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiff differently than similarly situated individuals because Plaintiff is a Hindu American of Indian/South Asian descent.

186.    As a result of Defendants' decision not to enforce its anti-discrimination policies evenly and uniformly, and selectively targeting Hindu Americans as a suspect class for racial profiling and monitoring, Plaintiff has suffered significant injuries.

187.    The Equal Protection Clause "prohibits the government from classifying people based on suspect classes, unless the classification is narrowly tailored to satisfy a compelling governmental interest (i.e., the government's action passes strict scrutiny)." *Days*, 36 F.4th at 953 (citing *Kadrmas*, 487 U.S. at 457–58).

188.    By deliberately, intentionally, and maliciously using the term caste coupled with archetypal Hindu words like "Brahmin" and "Dalit" in the report and recommending its addition, the task force has created de facto suspect classes by targeting Hindus (religion) and people of Indian/South Asian descent (ancestry).

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

189.    By using archetypal Hindu words like "Brahmin" and "Dalit" in the report that are not facially neutral, Defendants impermissibly created, and therefore targeted, suspect classes of Hindu students and those of Indian/South Asian origin at Rutgers.

190.    By adding caste to the policy, Defendants will have impermissibly created, and therefore targeted, suspect classes of Hindu Rutgers students and those of Indian/South Asian origin.

**FIFTH CLAIM FOR VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION – 42 U.S.C. § 1983**

191.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

192.    A government policy, statute, or regulation violates the Due Process Clause of the Fourteenth Amendment where it "is unclear as to what facts must be proved" to violate it. *United States v. Williams*, 553 U.S. 285, 306 (2008).

193.    Such vagueness claims are actionable under 42 U.S.C. § 1983.

194.    First, laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. . . . The vagueness doctrine's second requirement aims to avoid arbitrary and discriminatory enforcement and demands that laws provide explicit standards for those who apply them. A law that relies on a subjective standard—such as whether conduct amounts to an annoyance—is constitutionally suspect. *Edge*, 929 F.3d at 664.

195.    The caste report is so vague that people of ordinary intelligence do not know what conduct is prohibited by the addition of caste to Rutgers Policy. The caste report assumes that caste discrimination can happen in only one direction from "Upper/Dominant/Oppressor" to

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

"Lower/Dominated/Oppressed" without considering reverse caste discrimination or the complex terminology and hierarchy of thousands of sub-castes. The caste report also does not address how those Americans who are agnostic, atheist, animist, irreligious, or pagan will be handled if they complain, or, are accused of, caste discrimination.

196.    The addition of caste to Rutgers policy does not provide explicit standards sufficient to survive a vagueness challenge.

197.    Thus, the addition of caste is unconstitutionally vague in violation of the Due Process Clause to the extent that it prohibits discrimination based on caste.

198.    Enforcing the addition of caste will not only cause Plaintiff (and others similarly situated) to live with the fear of being disciplined for committing discrimination they did not commit, but such accusations also – and indeed the mere stereotypes and implicit bias the term caste has perpetuated – will follow Plaintiff throughout the rest of Plaintiff's career and life. Similarly, because the caste report does not describe what repercussions exist for alleged caste discrimination (or even explain what caste discrimination is), anyone in Rutgers, regardless of their ancestry or actual religious beliefs, could be subject to being branded as "oppressors" and might be prosecuted if they are even accused of caste discrimination without any evidence.

199.    Unless Defendants are enjoined and restrained from enforcing the recommendation of this report adding caste as a Protected Status, Plaintiff will be irreparably injured and deprived of rights under the United States Constitution forever.

### SIXTH CLAIM FOR VIOLATION OF 42 U.S.C. § 1985 (3) –
### Conspiracy to interfere with civil rights and free association rights

200.    Facial non-neutrality is not the only way to invalidate a law. Even facially neutral laws are invalid if they have uneven, or disparate, effects along racial or ethnic lines, and are motivated by a desire to hurt or demean a particular racial or ethnic group such as Hindu Americans.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

201.    An invidious and illicit motive is self-evident from Truschke's caste report. The report and its recommendation are concededly merely declarative of Rutgers policy that already exists i.e., a more neutral ban on all ancestry-based discrimination. The thinness of the clarification motive for the report's enactment opens the door to the possibility the report is intended to target and condemn particular communities with whom the term caste is deeply (and stereotypically) associated such as Hindu Americans of Indian/South Asian descent.

202.    A March 2023 survey by CoHNA on the American understanding of caste  provides evidence of deeply entrenched biases with the word caste – "most Americans associate caste with India (and therefore Hinduism) and believe there are only four castes; nine out of ten Americans had no idea how to tell someone's caste based on markers such as last name, skin color, educational level, hair texture, etc.; their understanding of caste is already shaped by the time they graduate high school; and, social media and online platforms play a very important role in shaping the understanding and 'experiences' of US-based Millennials."

203.    Any Ordinance, Policy, or law, using the term caste, will attract biases about the origins and nature of caste, which will result in racial profiling, targeting, and stereotyping of South Asians, especially people of Indian and Hindu origin, resulting in Government overreach.

204.    Due to Truschke's conspiracy with other actors, Plaintiff has refrained from participating in CoHNA activities and has stopped making monetary donations to CoHNA since Truschke has deemed it a right-wing organization. This interferes with Plaintiff's free association rights.

### SEVENTH CLAIM FOR VIOLATION OF 42 U.S.C. § 1981 –
### Interference with Right to Contract, Breach of Contract,
### Implied Covenant of Good Faith, and Fair Dealing

205.    42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts. . .as is enjoyed by white citizens." "The term `make and enforce contracts' includes the making. . . of

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).

206.    To be actionable under § 1981, a contractual relationship need not already exist, "because § 1981 protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

207.    The US Supreme Court has recognized that ethnic groups like Jews, and therefore Hindus, may state a claim of racial discrimination under the civil rights statutes, including § 1981 and its sister statute, 42 U.S.C. § 1982. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 618 (1987) ("Jews are not foreclosed from stating a cause of action against other members of what today is considered to be part of the Caucasian race."); *see also id.* (citing the analysis of *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987), which examined Section 1981).

208.    At all relevant times, an express contractual relationship existed between Rutgers, on the one hand, and each of the Hindu student members, including Plaintiff, on the other hand, by virtue of their enrollment at Rutgers and as defined by and through Rutger's written codes, policies, and procedures, including, but not limited to, the: Non-Discrimination Policy, DEI Policy, Statement on Rights and Responsibilities, Free Speech Guidelines, Student Organization Policies, and Rutger's various student handbooks, which often adopt and expand on University-wide policies. Through the documents and materials it publishes and provides to students, Rutgers makes contractual commitments to its students concerning safety, bias-related abuse, harassment, intimidation, and discrimination.

209.    Under those contracts, Plaintiff and each of the Hindu Rutgers student members agreed, among other things, to pay Rutgers tuition, and Rutgers agreed, among other things, to provide them a discrimination-free environment to be achieved by Rutgers abiding by, and adequately and appropriately enforcing Rutger's policies.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

210.   Plaintiff has complied and continues to comply with his obligations under these contracts.

211.   Rutgers breached and continues to breach its contracts with Plaintiff and other Hindu Rutgers student members by, among other things, its continued failure to comply with its obligations under these contracts, including by, among other things, failing to take measures to ameliorate, prevent, and punish the discriminatory, intimidating, and harassing conduct that Plaintiff and other Hindu Rutgers student members have endured and continue to endure, failing to enforce numerous provisions of Rutgers's policies, failing to meet Plaintiff and other Hindu Rutgers student members' reasonable expectations of the educational benefits to which they are entitled.

212.   As a result of Rutger's breaches, Plaintiff and other Hindu Rutgers student members have been damaged and continue to sustain substantial damages, in amounts to be determined at trial.

213.   Rutgers has breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Plaintiff and other Hindu Rutgers student members. Among other things, Rutgers selectively applies (or plans to apply) or enforces (or plans to enforce) its caste report, student handbooks, guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and regulations in bad faith and in a discriminatory way— improperly motivated by caste, shared ancestry, race, religion, ethnic characteristics, or national origin bias—treating incidents of abuse, harassment, intimidation, or discrimination against Hindu students, including Plaintiff and other Hindu Rutgers student members, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

214.    As a result of Rutger's breaches, Plaintiff and other Hindu Rutgers student members have been damaged and continue to sustain substantial damages, in amounts to be determined at trial.

### EIGHTH CLAIM FOR VIOLATION OF
### New Jersey Law Against Discrimination
### (NJLAD) - N.J.S.A. 10:5-1 et seq.

215.    Rutgers, including all its campuses, operated by Defendants, is/are a place of public accommodation within the meaning of the NJLAD.

216.    Defendants knew or should have known about the discriminatory conduct and/or harassment conduct.

217.    Defendants denied Plaintiff the privileges and advantages of public education because of Plaintiff's membership in classes protected under the NJLAD, including, but not limited to, being a Hindu American of Indian/South Asian descent.

218.    A reasonable student in the same situation as Plaintiff would consider harassment and discrimination sufficiently severe and/or pervasive enough to create an intimidating, hostile, and offensive school environment.

219.    Plaintiff endured severe and/or pervasive harassment and discrimination that created an intimidating, hostile, and offensive school environment, including but not limited to the conduct described supra.

220.    Rutgers leadership and administration knew of the harassment and discrimination, yet failed to take effective measures to address the harassment and discrimination to which Plaintiff was unmercifully subjected to by Defendants.

221.    Further, Defendants failed to properly train Rutgers employees, staff, and contractors, including, but not limited to, appropriately investigating the conduct of students, student organizations, faculty, staff, senate, and unions and/or failing to professionally train

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

administrators in instituting effective schemes to remediate anti-Hindu activities within the Rutgers communities and learning environments.

222.    Defendants, with malice or willful or wanton disregard of Plaintiff's rights, fomented a hostile and discriminatory educational environment in violation of the NJLAD.

223.    N.J.S.A. 10:5-4 states, in pertinent part: *All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, . . . without discrimination because of . . . creed . . . subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.*

224.    Plaintiff endured severe and/or pervasive discriminatory treatment in so far as Plaintiff was treated less favorably than individuals who were similarly situated but who were not Hindu, including but not limited to the acts and omissions as described supra.

225.    Defendants through their acts and omissions, aided and abetted Rutgers, its students, faculty, staff, senate, unions, agents, and contractors, in harassment and discrimination against Plaintiff and other Rutgers Hindu student members.

226.    NJLAD prohibits individuals from aiding and abetting an employer in discriminating against an employee, hence Rutgers has *respondeat superior* vicarious liability for all Defendants, including, John and Jane Does 1 to 100 and ABC Corps. 1 to 100.

227.    Despite such notice, Defendants treated Plaintiff and other Hindu Rutgers students less favorably than other non-Hindu students similarly situated.

228.    Defendants have abjectly failed to take prompt or effective remedial measures.

229.    Defendants have unnecessarily and without justification delayed or failed to investigate the conduct of faculty, staff, students, senate, unions, agents, and contractors engaging in anti-Hindu hate and Hinduphobia.

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

230.    As a direct and proximate result of Defendants' conduct and omissions against Plaintiff in violation of the NJLAD, Plaintiff has been damaged.

### RESERVATION OF RIGHTS

231.    Plaintiff reserves the right to add, revise, or withdraw any claims, or add additional claims or Defendants during the course of litigation as information is gained through litigation.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for judgment against Defendants, in their official capacities, and relief as follows:

A.    Injunctive relief preventing and enjoining Rutgers from violating Title VI, including, but not limited to, preventing and enjoining Rutgers and its agents, Rutgers Senate, Rutgers Faculty groups, Rutgers Student groups, Rutgers Unions, and Rutgers contractors like Equality Labs from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Hindu students, including plaintiff and other Hindu student members, in any way, and ordering Rutgers to take all necessary, adequate, and appropriate remedial, corrective, and preventative measures including by, among other things: (i) disciplinary measures, including the termination of, deans, administrators, professors, students and other employees or staff responsible for anti-Hindu discrimination and abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against all Rutgers entities and individuals who engage in such conduct; (iii) declining and returning donations, whether from special interest groups, foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse anti-Hindu hate or the inclusion of anti-Hindu coursework or curricula; and (iv) adding required anti-Hindu discrimination training for Rutgers community members;

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

B. For an immediate, temporary restraining order enjoining Defendants from enforcing the caste report to the extent that it prohibits discrimination based on caste;

C. For a preliminary injunction enjoining Defendants from enforcing the caste report to the extent that it prohibits discrimination based on caste;

D. For permanent injunctive relief preventing Defendants from enforcing the caste report to the extent that it prohibits discrimination based on caste;

E. For a declaratory judgement that Defendants violated Plaintiff's rights as secured by the First Amendment, Fourteenth Amendment, Title VII of the Civil Rights Act, 42 U.S.C. § 1985 (3), Conspiracy to interfere with civil rights and free association rights, right to contract as ensured by 42 U.S.C. § 1981, and the NJLAD;

F. Compensatory damages against the Defendants determined by the Court to compensate Plaintiff for their breach of contract and for interference with Plaintiffs rights under the US Constitution and for the significant emotional distress, mental trauma, humiliation, intimidation, and belittlement experienced by Plaintiff;

G. Enjoin the Defendants from engaging in any act or practice that seeks to define Hinduism or any other religion as including a caste system or any other belief or practice;

H. Enjoin the Defendants from ascribing religious or moral beliefs or practices to persons or groups who expressly disclaim any such beliefs or practices;

I. Enjoin the Defendants from engaging with, or using any caste competency trainings provided by Rutgers or contractors like Equality Labs or any other entities or persons associated with Rutgers or Equality Labs;

J. Compensatory, consequential, and punitive damages in amounts to be determined at trial;

K. Retain jurisdiction over this action to assure full compliance with the orders of the Court

*Stop Weaponization of Caste to Single Out, Target, & Racially Profile Hindu Americans.*

and with applicable law and require Defendants to file such reports as the Court deems necessary to evaluate compliance;

L.  For attorneys' fees and costs (should Plaintiff retain an attorney in the future) under 42 U.S.C. § 1988 and other applicable law. Plaintiff is not seeking attorney's fees and costs for any *pro se* work;

M.  Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

N.  For such all further legal and equitable relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues so triable.

## CERTIFICATION AND CLOSING

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 30th day of December 2024.

Signature of Plaintiff      *Abhijit Bagal*

Printed Name of Plaintiff      ABHIJIT BAGAL
                              Plaintiff, *Pro Se*
Mailing Address of Plaintiff:  125 Vista Brooke Drive
                              Morrisville, NC 27560
                              Phone: (919) 917-3839
                              Email: abebagal@gmail.com

Signature of Plaintiff      *Abhijit Bagal*    (ABHIJIT BAGAL)